IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CESAR DIAZ,

        Plaintiff,               No. 2:10-CV-2039 GGH (TEMP)

    vs.

MICHAEL J. ASTRUE,          ORDER
Commissioner of
Social Security,

        Defendant.

_____/

        Plaintiff is an individual who received Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act") based on disability as a child.  Eligibility for these benefits was redetermined under the rules for determining disability in adults after plaintiff attained the age of 18.  Plaintiff now seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") concluding that plaintiff's disability ended on December 13, 2007.

        For the reasons that follow, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and judgment is entered for defendant.

\\\

1

BACKGROUND

Plaintiff, born December 31, 1988, was awarded SSI as a disabled child as of November 21, 2002.  (Tr. at 13, 23, 443.)  On April 8, 2008, after plaintiff, who suffers from borderline intellectual function and cardiomyopathy, attained the age of 18, the Commissioner determined that plaintiff was no longer disabled as of April 8, 2008.  (Tr. at 24.)[1]  Plaintiff sought reconsideration, and on November 6, 2008, a disability hearing officer upheld the determination that plaintiff's disability ceased as of April 8, 2008.  (Tr. at 25-26.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on September 11, 2009. (Tr. at 42, 430.)  At the hearing, plaintiff was represented by counsel, and a medical expert, Dr. Alan Frank, and a vocational expert, Mr. Stephen Schmidt, also testified.  (Tr. at 430-71.)

In a decision dated February 26, 2010, ALJ James M. Mitchell determined that plaintiff's disability ended on December 13, 2007.  (Tr. at 21.)  The ALJ made the following findings:[2]

---

[1]  The Social Security Act provides that if an individual is eligible for Title XVI benefits as a result of disability for the month preceding the month in which that individual attains the age of 18, the Commissioner must redetermine eligibility by applying the criteria used for adult disability claims. 42 U.S.C. § 1382c(a)(3)(H)(iii); see also 20 C.F.R. § 416.987(b) ("[w]hen we redetermine your eligibility, we will use the rules for adults (individuals age 18 or older) who file new applications"). The medical improvement review standard set forth by section 1614(a)(4) of the Act is not applicable to this determination. See 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987(b).

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
    Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
    Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

1.      The claimant attained age 18 on December 30 [sic], 2006 and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18.  The claimant was notified that he was found no longer disabled as of April 1 [sic], 2008, based on a redetermination of disability under the rules for adults who file new applications.

2.      At the hearing level, it was determined that the claimant was no longer disabled as of December 13, 2007.

3.      Since December 13, 2007, the claimant has had the following severe impairments: cardiomyopathy and borderline intellectual functioning.

4.      Since December 13, 2007, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that since December 13, 2007, the claimant has had the following residual functional capacity: the ability to lift, push, and pull 20 pounds occasionally and 10 pounds frequently; the ability to walk/stand frequently; the ability to sit, stoop, and bend occasionally; and the slightly limited ability to do simple, routine, repetitive tasks.  The claimant requires occasional supervision and has slight to moderate pain.

6.      The claimant has no past relevant work (20 CFR 416.965).

7.      The claimant was born on December 31, 1988 and is a younger individual age 18-49 (20 CFR 416.963).

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
       The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

3

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10.     Since December 13, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

11.     The claimant's disability ended on December 13, 2007, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

(Tr. at 15-20.)  Subsequently, on June 9, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. at 5-7.)

ISSUES PRESENTED

        Plaintiff's motion presents the following issues for review: (1) whether the ALJ improperly failed to consider plaintiff's pre-2007 IQ test results; (2) whether the ALJ improperly failed to address evidence concerning plaintiff's learning disorders; and (3) whether the ALJ erred in crediting the testifying medical expert's opinion with respect to plaintiff's physical limitations.

LEGAL STANDARDS

        The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

4

1   resolving ambiguities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

2   omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

3   than one rational interpretation." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1038 (9th Cir. 2008).

4   <u>ANALYSIS</u>

5           <u>(1) Whether the ALJ improperly failed to consider plaintiff's pre-2007 IQ test</u>

6           <u>results</u>

7           Plaintiff first argues that the ALJ erred in failing to discuss or reconcile

8   differences in the evidence as to plaintiff's IQ and instead simply adopted the most recent IQ test

9   results. Plaintiff contends that the pre-2007 IQ test results are significant, because they indicate

10  that plaintiff meets the first prong of Listing 12.05C.

11          In concluding that plaintiff's borderline intellectual functioning did not meet

12  Listing 12.05, the ALJ found that "[s]ince December 13, 2007, the claimant has not received an

13  IQ score of 70 or below." (Tr. at 16.)

14          Listing 12.05, which relates to mental retardation, is described as follows:

15          Mental retardation refers to significantly subaverage general
            intellectual functioning with deficits in adaptive functioning
16          initially manifested during the developmental period; i.e., the
            evidence demonstrates or supports onset of the impairment before
17          age 22.

18          The required level of severity for this disorder is met when the
            requirements in A, B, C, or D are satisfied....
19
            C.  A valid verbal, performance, or full scale IQ of 60 through 70
20          and a physical or other mental impairment imposing an additional
            and significant work-related limitation of function;....
21

22  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

23          The record contains three sets of IQ test results. The first evaluation was

24  performed on January 13, 2003 by consultative examiner Dr. Mary McDonald, Ph. D., a licensed

25  psychologist, when plaintiff was 14 years old and in the 8th grade. (Tr. at 288-95.) On the

26  Wechsler Intelligence Scale for Children, Third Edition, plaintiff obtained a Verbal IQ of 52, a

5

Performance IQ of 55, and a Full Scale IQ of 50.  (Tr. at 290.)  Dr. McDonald noted that these scores placed him clearly within the range of mild mental retardation.  (Tr. at 290.)  However, after conducting the Wide Range Achievement Test, Third Edition, Dr. McDonald stated that "he performed better on tests of academics that involved reading, spelling and arithmetic, than he did in terms of the intellectual testing, suggesting that his true potential may well be within the borderline to low average range."  (Tr. at 290.)

The second evaluation was performed on November 17, 2004 by Scott Fry, M.S., a school psychologist, when plaintiff was 15 years old and in the 10th grade.  (Tr. at 305-09.)  This time, on the Wechsler Intelligence Scale for Children, Fourth Edition, plaintiff obtained scores of 69 in Verbal Comprehension, 71 in Perceptual Reasoning, 71 in Working Memory, 85 in Processing Speed, and a Full Scale IQ of 68.  (Tr. at 307.)  The psychologist noted that because plaintiff comes from a bilingual background, "his cognitive abilities should be interpreted with special care.  Verbal scores, in particular, are likely to underestimate [plaintiff's] true level of cognitive functioning and thus cannot be considered valid measures of his intellectual ability."  (Tr. at 307.)

The third evaluation was performed on March 25, 2008 by consultative examiner Dr. David C. Richwerger, Ed. D., a licensed psychologist and a Diplomate in Psychological Disabilities Evaluation, when plaintiff was 19 years old and attending community college.  (Tr. at 354-59.)  On the Wechsler Adult Intelligence Scale, III, plaintiff obtained a Verbal IQ of 74, Performance IQ of 73, and a Full Scale IQ of 71.

Thus, according to the pre-2007 IQ test results, plaintiff meets the first prong of Listing 12.05(C), whereas the 2008 IQ test results indicate that plaintiff does not satisfy the requirements of Listing 12.05(C).  Generally, when assessing residual functional capacity ("RFC"), the ALJ is required to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, at *7.  Also, "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why

1  the opinion was not adopted." Id.  There is no reason to suppose that these principles do not

2  apply when considering whether a claimant meets or equals a listing at step 3.  See e.g. SSR 96-

3  6p; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (holding that the ALJ must explain

4  why "significant probative evidence has been rejected").

5  Nevertheless, in this case, substantial evidence supports the ALJ's decision.  As

6  an initial matter, plaintiff's presumption that the ALJ entirely failed to consider the pre-2007 IQ

7  test results is not supported by the record.  To the contrary, the ALJ specifically stated that

8  "[s]ince December 13, 2007, the claimant has not received an IQ score of 70 or below."  (Tr. at

9  16 (emphasis added).)  Thus, the ALJ made clear that he was aware of the prior test results, but

10  was instead relying on the most recent test results for the current determination.  See Magallanes

11  v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) ("As a reviewing court, we are not deprived of our

12  faculties for drawing specific and legitimate inferences from the ALJ's opinion.")

13  The ALJ's reliance on the most recent test results is not only reasonable as a

14  matter of logic, but especially appropriate in the context of a redetermination upon reaching the

15  age of eighteen.  The purpose of the redetermination is to evaluate whether disability as a child

16  continues into adulthood.  In this case, the only adult IQ test results indicate that plaintiff does

17  not meet Listing 12.05(C), and plaintiff has failed to present any contradictory adult IQ evidence.

18  As such, the ALJ properly relied on the most recent IQ test results.  Plaintiff makes much of

19  Listing 12.05(C)'s requirement that the mental retardation present itself prior to age 22.

20  However, that is of no consequence here, because all three of plaintiff's IQ tests were

21  administered prior to the age of 22, and the language of Listing 12.05(C) does not dictate any

22  particular interpretation of different test results obtained prior to the age of 22.  The ALJ was

23  justified in relying on the most recent test results for purposes of the redetermination.

24  Indeed, plaintiff incorrectly assumes that the ALJ discredited the prior IQ test

25  results.  The prior 2003 and 2004 tests were conducted when plaintiff was still a child and during

26  a time when the Commissioner found plaintiff to be disabled.  The ALJ only determined that

plaintiff was not disabled as of December 13, 2007, and thus there was no actual conflict to resolve.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (holding that the ALJ need not provide reasoning if there is no conflict and the medical findings are accepted).  Moreover, as discussed above, both consultative examiner Dr. McDonald and school psychologist Mr. Fry found that some of plaintiff's test results were likely to underestimate plaintiff's true abilities.  (Tr. at 290, 307-08.)

Plaintiff argues that the ALJ should nonetheless have considered the prior IQ test results because a person's IQ is generally presumed to remain stable over time.  However, the cases plaintiff cites for this contention all hold that the general presumption only operates *in the absence of any evidence of a change in a claimant's intellectual functioning*.  See e.g. Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985); Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir. 1986); Luckey v. Department of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989); Sird v. Chater, 105 F.3d 401, 402 n.4 (8th Cir. 1997).  Here, there is substantial and objective evidence of a change in plaintiff's intellectual functioning – results from the most recent March 25, 2008 IQ test conducted by Dr. Richwerger.

Moreover, plaintiff presumes the earlier tests showed plaintiff's true potential as an adult in lieu of more recent tests.  Why?  Simply assuming that IQ remains stable over time is no reason *per se* to believe that the later tests were somehow deficient.  There is just as much reason, and indeed more so, to conclude that the earlier tests produced inaccurate results in terms of measuring true intellectual potential.  Moreover, the doctors who conducted the earlier testing expressed doubts themselves about the validity, i.e., measure of true potential, of the lower scores.

Plaintiff also contends that where multiple or conflicting IQ scores are available, the lowest score must always be utilized for purposes of evaluating a 12.05 listing.  In support of this proposition, plaintiff cites to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c); Ray v. Chater, 934 F. Supp. 347, 350 (N.D. Cal. 1996); and Fanning v. Bowen, 827 F.2d 631, 633 (9th

1   Cir. 1987).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) is inapposite, because it

2   requires the ALJ to utilize the lowest score derived from a single administered test.  By its terms,

3   it does not address the issue of scores obtained from tests administered at different times.[3]  Ray is

4   also readily distinguishable, because in that case, the most recent evaluation showed that plaintiff

5   met the IQ requirement of the listing.  Ray, 934 F. Supp. at 348.  Finally, at an initial glance,

6   Fanning arguably lends some support to plaintiff's argument.  In that case, the claimant achieved

7   a full scale IQ of 69 on the Wechsler Adult Intelligence Scale in December, 1982.  Fanning, 827

8   F.2d at 633.  Subsequently, in November, 1983, the claimant achieved a full scale IQ of 72 on the

9   same test.  Id.  Based on the earlier lowest score of 69, the ALJ found that the claimant had

10  satisfied the first prong of Listing 12.05(C).  Id.  However, the issue presented to the court in

11  Fanning was whether the second prong of Listing 12.05(C) was met, and the court did not

12  actually review the ALJ's analysis as to the first prong.  Furthermore, the case is factually

13  distinguishable, because it involved two adult IQ scores assessed less than one year apart.  Thus,

14  under the circumstances, it is not surprising that the ALJ gave that claimant the benefit of the

15  doubt by crediting the lower score.  By contrast, plaintiff's 2003 and 2004 scores were assessed

16  when plaintiff was a child and more than three years prior to the date plaintiff was found not

17  disabled as an adult.  And again, the doctors who performed the tests resulting in the lowest

18  score, and the next lowest scores, had real doubt whether those tests measure plaintiff's true

19  intellectual potential.

20          Plaintiff argues that the 2008 IQ results are of limited probative value, because Dr.

21  Richwerger did not have copies of plaintiff's prior medical records and school records, and was

22  without any details about the nature of his special education program.  This argument is without

23  merit.  An IQ test is an objective test, which renders objective test results.  There is no indication

24

25          [3]  The regulation provides, in part, that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."  20

26  C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c).

1    that a review of plaintiff's prior medical and school records would have made any difference

2    with respect to the results of the IQ test administered by Dr. Richwerger.

3            Finally, as discussed at length in the following section, plaintiff's actual life

4    performance points to a higher level of intellectual functioning, not lower.  Plaintiff was able to

5    graduate high school *and* perform fairly well in community college.  Unless those schools were

6    simply handing out sympathy grades, and there is no evidence to suggest that such was the case,

7    plaintiff performs at a level of intellectual functioning consistent (if not better) with the higher IQ

8    score and inconsistent with the lower scores.  The undersigned has also considered the

9    contemporaneous comments to the effect that when plaintiff expends a modicum of effort, he

10   does well.

11           Therefore, the ALJ's evaluation of the IQ test results and consequent finding that

12   plaintiff does not meet the requirements of Listing 12.05(C) are free of legal error and supported

13   by substantial evidence in the record as a whole.

14           (2) Whether the ALJ improperly failed to address evidence concerning plaintiff's

15           learning disorders

16           Plaintiff next argues that the ALJ failed to address evidence concerning plaintiff's

17   learning disorders and the impact of related limitations on plaintiff's ability to work as a cashier

18   (a representative occupation identified by the VE).

19           On January 13, 2003, when plaintiff was 14 years old and in the 8th grade,

20   consultative examiner Dr. McDonald, in addition to testing plaintiff's IQ, conducted the Wide

21   Range Achievement Test, Third Edition.  Test results indicated that plaintiff scored at the third

22   grade level in terms of reading (word recognition) and spelling, and at the fifth grade level in

23   terms of arithmetic.  (Tr. at 290.)  She indicated that the scores "were indicative of learning

24   difficulties, but not necessarily developmental delay.  Indeed he performed better on tests of

25   academics that involved reading, spelling and arithmetic, than he did in terms of the intellectual

26   testing, suggesting that his true potential may well be within the borderline to low average

1    range." (Tr. at 290.)  Dr. McDonald diagnosed plaintiff with three learning disorders on Axis I

2    per DSM IV – reading disorder, mathematical disorder, and disorder of written expression.  (Tr.

3    at 291.)  She further commented that plaintiff "does exhibit the potential for borderline to low

4    average intellectual ability, but has some serious problems with self esteem, which affect his

5    overall functioning.  He certainly exhibits delays in terms of learning that are consistent with the

6    diagnosis of learning disabilities in terms of verbal areas, mathematical and written expression."

7    (Tr. at 291.)

8            On November 17, 2004, when plaintiff was 15 and in the 10th grade, school

9    psychologist Mr. Fry, in addition to IQ testing, also conducted the Woodcock Johnson Third

10   Edition achievement test.  (Tr. at 307.)  This test indicated that plaintiff's broad reading skills fell

11   in the very low range, his broad math skills fell in the low range, his broad written language skills

12   fell in the low average range, his oral language skills fell in the low range, and his reading

13   comprehension skills fell in the very low range.  (Tr. at 307.)  Mr. Fry noted that "it was evident

14   that motivation for academic tasks may be a concern.  [Plaintiff] suggested that he could earn

15   better grades if he tried harder.  His attendance is regular.  He does unsatisfactory classwork and

16   fails to make up work according to some of his teachers."  (Tr. at 307.)  Mr. Fry also stated that

17   "[t]est results indicate that [plaintiff's] intellectual ability falls in the very low range.  This is

18   likely a low estimate of his true functioning given that his lowest area of cognitive functioning

19   (Verbal Comprehension), is greatly influenced by cultural and linguistic factors.  Based on the

20   full battery of testing and this examiner's impression of [plaintiff], he most likely has overall

21   intellectual ability in the low (borderline) range."  (Tr. at 308.)  Mr. Fry opined that plaintiff's

22   "personal commitment to getting better grades and working harder will make the most difference

23   in his school success."  (Tr. at 308.)

24           Defendant argues that the ALJ was not required to address the issue of learning

25   disorders, because Dr. McDonald's diagnosis in 2003 occurred well before the ALJ determined

26   that plaintiff's disability had ceased in 2007.  Moreover, defendant points out that consultative

1   examiner Dr. Richwerger, who examined plaintiff in 2008, did not diagnose plaintiff with any

2   learning disorder on Axis I.  (Tr. at 358.)  Dr. Richwerger diagnosed plaintiff with borderline

3   intellectual functioning on Axis II, a Full Scale IQ of 71, a GAF of 70,[4] and listed plaintiff's

4   prognosis as good.  (Tr. at 357-58.)  He opined that plaintiff has moderate to marked impairment

5   in his ability to perform detailed and complex tasks; slight impairment in his ability to perform

6   work activities on a consistent basis, and understand and accept instructions from supervisors;

7   and no impairment in his ability to perform simple and repetitive tasks, perform work activities

8   without special supervision, complete a normal workday or workweek without interruption from

9   a psychiatric condition, interact with coworkers and the public, maintain regular attendance in the

10  workplace, and deal with the usual stresses encountered in competitive work.  (Tr. at 358-59.)

11  He did note that plaintiff was not capable of managing his own funds and appeared to have

12  significant difficulty in that area.  (Tr. at 359.)

13          Ordinarily, the fact that Dr. Richwerger did not diagnose a learning disorder

14  would be sufficient substantial evidence in itself to support the ALJ's decision.  Tonapetyan v.

15  Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that a consultative examiner's opinion

16  alone "constitutes substantial evidence, because it rests on his own independent examination").

17  Dr. Richwerger's assessment is not only the most recent assessment performed by a consultative

18  examiner, but also the only mental examination performed after plaintiff reached adulthood.

19  However, the problem here is that Dr. Richwerger was not provided access to plaintiff's prior

20  medical and/or school records.  (Tr. at 354.)[5]  As such, he was without the details as to plaintiff's

21

22          [4] GAF is a scale reflecting "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
23  Disorders 34 (4th ed. 2000) ("DSM IV").  According to the DSM IV, a GAF of 61-70 indicates
    "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social,
24  occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
    generally functioning pretty well, has some meaningful interpersonal relationships."  Id.

25
          [5] The regulations require that a consultative examiner be given any necessary background
26  information about the plaintiff's condition.  20 C.F.R. § 404.1517.  Background information is

1 prior assessments and test results, including Dr. McDonald's earlier diagnosis of learning

2 disorders.

3          Nevertheless, after a review of the entire record, the court concludes that any

4 error in failing to address the evidence concerning plaintiff's learning disorders was harmless for

5 several reasons.  First, although Dr. Richwerger did not formally diagnose plaintiff with learning

6 disorders, it is highly unlikely that he failed to consider that plaintiff would have learning

7 difficulties with a Full Scale IQ of 71.  Even a layperson could anticipate learning difficulties at

8 that IQ level.  Given that Dr. Richwerger performed a full psychological evaluation, including IQ

9 and memory testing, his assessment likely took account of limitations attributable to learning

10 difficulties.

11          Second, the record evidence supports the ALJ's finding that plaintiff was only

12 slightly limited in his ability to do simple, routine, repetitive tasks.  (Tr. at 17.)  Both Dr.

13 McDonald and Mr. Fry indicated that self-esteem and motivation for academic tasks were a

14 concern, and Mr. Fry suggested that his academic performance could improve with commitment

15 and hard work.  (Tr. at 291, 307-08.)  In fact, following Mr. Fry's testing, the school district

16 formulated an Individualized Education Program ("IEP") for plaintiff, indicating that plaintiff

17 should participate in the general education environment for all classes, except for physical

18 education due to his cardiac impairment.  (Tr. at 314.)  The IEP noted that plaintiff could work

19 cooperatively on group projects, demonstrated communication skills and social behavior

20 appropriate for his age, demonstrated adequate prevocational and vocational skills such as

21 following simple written directions and multi-step written directions, and possessed age-

22 appropriate self-help skills.  (Tr. at 312.)  The IEP further stated that plaintiff had "passed his

23 general education classes last year and believes that he can pull his low grades up before the

24 semester ends."  (Tr. at 317.)

25

26 essential because consultative exams are utilized "to try to resolve a conflict or ambiguity if one
exists."  20 C.F.R. § 404.1519a(a)(2).

1    Subsequently, plaintiff graduated from high school and started attending Delta

2    Community College.  (Tr. at 443.)  On January 4, 2008, plaintiff reported to his treating

3    cardiologist, Dr. Coulson, that he was a sophomore at Delta College with good grades.  (Tr. at

4    418.)  Dr. Coulson's treatment notes dated May 7, 2008 stated that plaintiff was continuing to

5    attend Delta College with an approximately B average.  (Tr. at 421.)  A review of plaintiff's

6    transcript indicates that he had a cumulative GPA of 2.93 as of the Fall, 2009 semester.  (Tr. at

7    198.)  Although he was only taking about 2-3 classes per semester and many of the classes

8    appear to be basic skills and general education classes, plaintiff did obtain A grades in his

9    historical reading and autobiography classes, and a B in his "Review of Arithmetic" class.  (Tr. at

10   198.)  The fact that plaintiff was able to complete high school and pass basic community college

11   classes supports the determination that plaintiff's ability to perform simple, routine, repetitive

12   tasks is only slightly limited.

13   Third, although Dr. Richwerger did not have access to plaintiff's prior medical

14   records and psychological testing, State Agency psychiatrist Donald Walk did review at least

15   school psychologist Mr. Fry's report and achievement test results.  (Tr. at 370.)  After his review

16   of plaintiff's records, Dr. Walk concluded that plaintiff was only moderately limited in his ability

17   to understand, remember, and carry out detailed instructions, and to respond appropriately to

18   changes in the work setting.  (Tr. at 394-95.)  Dr. Walk specifically opined that plaintiff could

19   complete simple repetitive tasks.  (Tr. at 396.)

20   In sum, a review of the entire record compels the conclusion that the ALJ's failure

21   to address plaintiff's learning disorders was harmless.  The record shows that plaintiff is only

22   slightly limited in his ability to perform simple, routine, repetitive tasks, especially given that

23   plaintiff was able to graduate from high school and pass basic community college classes,

24   including an arithmetic class.  For these reasons, substantial evidence supports the ALJ's

25   \\\\\

26   \\\\\

1    determination that plaintiff can perform work as a cashier according to the VE's testimony

2    despite the existence of any learning disorders.[6]

3                    (3) Whether the ALJ erred in crediting the testifying medical expert's opinion

4    with respect to plaintiff's physical limitations

5              The ALJ determined that, despite his severe hypertrophic cardiomyopathy,[7]

6    plaintiff had the physical residual functional capacity to perform light work.  (Tr. at 15, 17.)

7    Plaintiff contends that the ALJ erred in crediting the testifying medical expert Dr. Frank's

8    opinion in this regard.  Plaintiff points out that the ALJ incorrectly described Dr. Frank as a

9    cardiologist, whereas he is actually an internist with no special expertise in the area of

10   cardiology.  However, it is clear that any such error was harmless, because the weight of the

11   record evidence supports the ALJ's finding that plaintiff can perform light work.

12             On December 13, 2007, State Agency physician Dr. Resnik reviewed plaintiff's

13   medical records and found that plaintiff was capable of light work (lifting and carrying 20

14   pounds occasionally and 10 pounds frequently, standing/walking/sitting about 6 hours in an 8-

15   hour workday with normal breaks).  (Tr. at 349-53.)  Dr. Resnik explained that plaintiff was

16   "[n]ow stable on medication and with the defibrillator."  (Tr. at 353.)

17             On January 4, 2008, treating physician Dr. John Coulson reported that plaintiff

18   continued to do well, was "normally active," and denied dyspnea on exertion, chest pain,

19   palpitations, presyncope, or syncope.  (Tr. at 418-19.)  He indicated that plaintiff's activities

20   should remain "moderately curtailed."  (Tr. at 419.)  On May 7, 2008, Dr. Coulson again noted

21

22         [6]  Plaintiff also highlights Dr. Richwerger's opinion that plaintiff was not capable of
     managing his own funds and appeared to have significant difficulty in that area.  (Tr. at 359.)
23   However, plaintiff's difficulty with managing personal finances and financial judgment does not
     necessarily mean that plaintiff is unable to do the basic arithmetic required to work as a cashier,
24   most of which is automated.

25         [7]  Plaintiff as a child suffered episodes of life-threatening ventricular tachycardia and
     ventricular fibrillation.  (Tr. at 318, 324, 371.)  In 2002, plaintiff underwent surgery for insertion
26   of a dual-chamber implantable cardioverter defibrillator.  (Tr. at 261-62, 371.)

that plaintiff was "normally active" and denied dyspnea on exertion, chest pain, palpitations, or syncope. (Tr. at 421.) He opined that plaintiff "may be normally active, although he should be allowed to rest if he does not feel well." (Tr. at 422.) On July 16, 2008, Dr. Coulson stated that plaintiff's defibrillator interrogation appeared satisfactory. (Tr. at 423.) When plaintiff and his mother expressed concern that plaintiff would lose health benefits upon turning 21, Dr. Coulson encouraged plaintiff to look for employment with health benefits and to inquire regarding what Social Security benefits might be available. (Tr. at 423.) On August 15, 2008, Dr. Coulson indicated that plaintiff's defibrillator was implanted in 2002, but had never discharged. (Tr. at 424.) He again noted that plaintiff reported being normally active without dyspnea on exertion, chest pain, palpitations, or recurrence of syncope. (Tr. at 424.) Dr. Coulson recommended that plaintiff avoid rigorous physical activity and rest if he does not feel well. (Tr. at 425.) Additionally, he completed a DMV form to help establish plaintiff's eligibility for a driver's license. (Tr. at 424.)

Subsequently, on October 16, 2008, plaintiff was examined by consultative examiner Dr. Dennis Breen, a board-certified cardiologist. (Tr. at 371-73.) Dr. Breen reported that plaintiff has been clinically stable for most of the time since his defibrillator was implanted in 2002, the most recent shock having occurred in 2004. (Tr. at 371.) Plaintiff denied chest pain and shortness of breath at low levels of activity. (Tr. at 371.) Dr. Breen noted that plaintiff was "functioning at a nearly normal level" and at a New York Heart Association functional class II to III level. (Tr. at 371.) He stated that plaintiff was "limited in his exercise capacity to climbing two flights of stairs, or walking six blocks, before having to stop to rest." (Tr. at 371.) He opined that plaintiff's prognosis is favorable with his excellent compliance and lifelong medical supervision. (Tr. at 373.)

On October 30, 2008, after reviewing plaintiff's prior medical records and evaluations, State Agency physician Dr. Patrick Bianchi found that plaintiff was limited to light work with additional non-exertional limitations. (Tr. at 383-91.) In particular, plaintiff could

never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to hazards such as machinery and heights.  (Tr. at 385-86.)

On January 7, 2009, plaintiff was seen by treating cardiologist Dr. Paul Francis, who observed that plaintiff had not had any episodes of ventricular tachycardia in approximately 4-1/2 years and that his cardiac condition was "well-controlled with his current medication."  (Tr. at 416-17.)  He felt that plaintiff should be able to drive, and noted that plaintiff would like to get a job, but feels that the "poor state of the economy has limited his opportunities for work."  (Tr. at 416-17.)

In addition to summarizing most of the above medical evidence indicating that plaintiff is capable of at least light exertion (tr. at 18-19),[8] the ALJ also explained that plaintiff's activities suggested "greater than sedentary capacity with the ability to perform simple tasks essentially intact."  (Tr. at 18.)  The ALJ noted that "[a]t the hearing, the claimant indicated that he prepares meals twice daily, mops floors three times a week, sweeps or vacuums twice a week, goes shopping twice monthly, makes his bed daily, uses a computer three hours a week, watches television two hours a day, reads one hour a day, listens to the radio three hours a day, attends church three times a month, walks 30 minutes a day, leaves his home 21 times a week, drives an automobile twice a day, and provides care for his cousin.  In an exertion questionnaire, the claimant indicated that he washes dishes (Exhibit 5E)."  (Tr. at 18, 126, 447-52.)  Accordingly, the opinions of treating, examining, and non-examining physicians, as well as plaintiff's daily

\\\\\

\\\\\

---

[8]  The ALJ reasoned that although statements by plaintiff's treating physicians, such as that his activity should remain "moderately curtailed" or that he should avoid rigorous physical activity, "can reasonably be interpreted to preclude heavy and medium exertion, a finding of light exertional capacity is not incompatible with these statements especially considering the doctor's simultaneous comments concerning the claimant's normal activity levels."  (Tr. at 18.)

1   activities, support the ALJ's finding that plaintiff has the physical residual functional capacity to

2   perform light work.[9]

3          Plaintiff further contends that Dr. Frank's testimony was unreliable, because he

4   misunderstood the New York Heart Association nomenclature.  In regards to consultative

5   examiner Dr. Breen's opinion that plaintiff was functioning at a New York Heart Association

6   functional class II to III level (tr. at 371), Dr. Frank testified that functional class II level signifies

7   a preclusion of heavy work only while a class III level signifies a capacity for sedentary work

8   only.  (Tr. at 440.)  The ALJ stated that "it is reasonable to conclude [based on the testimony]

9   that the claimant retains the ability for light exertion, which is greater than sedentary but less than

10  heavy exertion."  (Tr. at 19.)  Plaintiff points out that the actual descriptions of class levels

11  according to the New York Heart Association are as follows:

12          Class I.  Patients with cardiac disease but without resulting
              limitation of physical activity.  Ordinary physical activity does not
13            cause undue fatigue, palpitation, dyspnea, or anginal pain.

14          Class II.  Patients with cardiac disease resulting in slight limitation
              of physical activity.  They are comfortable at rest.  Ordinary
15            physical activity results in fatigue, palpitation, dyspnea, or anginal
              pain.
16
            Class III.  Patients with cardiac disease resulting in marked
17            limitation of physical activity.  They are comfortable at rest.  Less
              than ordinary activity causes fatigue, palpitation, dyspnea, or
18            anginal pain.

19          Class IV.  Patients with cardiac disease resulting in inability to
              carry on any physical activity without discomfort.  Symptoms of
20            heart failure or the anginal syndrome may be present even at rest.
              If any physical activity is undertaken, discomfort is increased.
21

22  (Tr. at 197.)

23  \\\\\

24

_____

25          [9]  Additionally, even if plaintiff were limited to sedentary work with the additional
    limitations noted by the ALJ, the VE indicated that plaintiff would be able to perform the
26  sedentary level jobs of information clerk and order clerk.  (Tr. at 467-68.)

1    As an initial matter, the court cannot conclude that Dr. Frank's translation of the

2    class II level as precluding heavy work and the class III level as allowing for sedentary work only

3    is incorrect.  His interpretation is not facially inconsistent with the descriptions of the class

4    levels, and plaintiff does not point to any countervailing medical evidence or interpretation.

5    Moreover, the challenged testimony only relates to one of Dr. Breen's findings.  Dr. Breen also

6    found that plaintiff was "limited in his exercise capacity to climbing two flights of stairs, or

7    walking six blocks, before having to stop to rest, " was "functioning at a nearly normal level,"

8    and had a favorable prognosis.  (Tr. at 371, 373.)  Thus, Dr. Breen's overall opinion is not

9    inconsistent with the ALJ's findings.  In any event, as outlined above, other significant

10   substantial evidence, including the records of the treating physicians, opinions of the State

11   Agency physicians, and testimony concerning plaintiff's daily activities, supports the ALJ's

12   conclusion that plaintiff has the physical residual functional capacity to perform light work.

13   CONCLUSION

14        Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED THAT:

15        1.  Plaintiff's motion for summary judgment (dkt. no. 18) is denied;

16        2.  Defendant's cross-motion for summary judgment (dkt. no. 21) is granted;

17        3.  Judgment is entered for defendant; and

18        4.  The Clerk of Court is directed to close this case.

19   DATED: January 6, 2012

20                         /s/ Gregory G. Hollows
                        UNITED STATES MAGISTRATE JUDGE

21

22   GGH/wvr
     Diaz.2039.ss.wpd

23

24

25

26